UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

JOE DUNCAN, LORETTA DUNCAN,       )
CHRIS JACKSON, JASON LYNCH,       )
DEBBIE JO DUNCAN, and             )
JOHNNY GROOMS,                    )
                                  )
        *Plaintiffs,*             )
*v.*                              )          No.1:03-cv-422
                                  )          *Edgar / Carter*
JAMES JACKSON, individually,      )
and the CITY OF SOUTH             )
PITTSBURG, TENNESSEE,             )
RONNIE BURNETT, individually,     )
and MARION COUNTY, TENNESSEE,     )
and the FEDERAL BUREAU OF         )
INVESTIGATION,                    )
                                  )
        *Defendants.*             )

## MEMORANDUM

Plaintiffs Joe Duncan, Loretta Duncan, Chris Jackson, Debbie Jo Duncan, and Johnny

Grooms bring this civil rights action against Defendants Marion County Sheriff Ronnie Burnett,

in his individual capacity, and Chief of Police for the City of South Pittsburg, James Jackson, in

his individual capacity.  This Court previously dismissed defendants Marion County, Tennessee

and the City of South Pittsburg, Tennessee.  [Court Doc. No. 40].  This Court has further

dismissed the Plaintiffs' claims against the Federal Bureau of Investigation ("FBI") without

prejudice.  [Court Doc. No. 12].  This Court has also dismissed claims against the Defendants

under 42 U.S.C. § 1981 and has dismissed various state law claims for lack of jurisdiction.  *See*

[Court Doc. No. 40].  The remaining claims challenge the constitutionality of a search conducted

at the residence of Joe and Loretta Duncan on December 26, 2002.  Plaintiffs bring claims for

-1-

violation of their Fourth and Fourteenth Amendment rights to the U.S. Constitution pursuant to 42 U.S.C. § 1983 ("Section 1983"). Plaintiffs further have a claim of trespass remaining against Chief Jackson and Sheriff Burnett.

Defendants Jackson and Burnett initially appealed this Court's partial denial of their summary judgment motions on qualified immunity to the Sixth Circuit. [Court Doc. No. 47]. Defendant Jackson subsequently moved this Court to expand the record to include deposition testimony not previously submitted to this Court. [Court Doc. No. 51]. This Court denied the motion without prejudice pending the Sixth Circuit's remand to this Court for the purpose of hearing Defendant Jackson's motion. [Court Doc. No. 53]. The Sixth Circuit has now remanded this action to this Court for the limited purpose of allowing Defendants to file a motion. Defendants' appeals to the Sixth Circuit remain in abeyance pending this Court's ruling.

Chief Jackson and Sheriff Burnett now move this Court to expand the record and to be allowed to file a reply brief in reply to Plaintiffs' opposition to Chief Jackson and Sheriff Burnett's motions for summary judgment. In addition, pursuant to Fed. R. Civ. P. 60(b), Chief Jackson and Sheriff Burnett move this Court for relief from this Court's order denying their motion for summary judgment in part. [Court Doc. Nos. 56, 57-1]. Plaintiffs have failed to file responses in a timely manner pursuant to Local Rule 7.1(a).

## I.     Defendants' Motion to Expand the Record

Chief Jackson and Sheriff Burnett have requested this Court to review the full depositions of Mr. Joe Duncan, Ms. Loretta Duncan, and Mr. Chris Jackson, as well as the full deposition of Sheriff Burnett and allow such additional evidence to be made a part of the record in this case. In the interest of having a complete record for the Court of Appeals and in deciding

the Defendants' motion for relief from judgment, the Court agrees to include these additional complete depositions as part of the record in this action. Therefore, the Court will **GRANT** Chief Jackson's and Sheriff Burnett's motions to expand the record.

Chief Jackson and Sheriff Burnett contend that this Court should disregard the affidavits previously filed by Loretta Duncan, Joe Duncan, and Chris Jackson in this action because their prior deposition testimony contradicts the affidavits they filed in support of their opposition to Defendants' summary judgment motions. However, this Court has reviewed the complete depositions submitted by Chief Jackson and Sheriff Burnett and concludes that they do not clearly contradict Plaintiffs' affidavits as much as Chief Jackson and Sheriff Burnett suggest. To the extent that Plaintiffs' affidavits do contradict their depositions, this Court will disregard such affidavit testimony. *See Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (citing *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984)).

## II. Background

The Court has previously summarized the material facts in dispute in its memorandum opinion regarding the Defendants' motions for summary judgment. [Court Doc. No. 39]. Therefore, the Court will summarize only the facts relevant to this motion.

The parties agree that on December 26, 2002 the FBI requested the back-up assistance of Sheriff Burnett, the Marion County Police Department, Chief Jackson, and the South Pittsburg Police Department in undertaking a search of the Duncan residence. The FBI informed Sheriff Burnett and Chief Jackson that it had received information that a suspect wanted in connection with a bank robbery in North Georgia might be located at the Duncan residence. [Court Doc. No. 21-3, Affidavit of Paul F. Healy ("Healy Aff."), ¶ 4]. FBI Special Agent Paul Healy

considered the individual to be armed and dangerous. *Id.* at ¶¶ 2, 6. The defendants do not allege that they had a valid search warrant to search the property.

The complete depositions of Loretta Duncan, Joe Duncan, and Chris Jackson help to explain the Plaintiffs' version of the facts. Ms. Duncan walked into her kitchen on the evening of December 26, 2002 and, in her words, found a "man standing there in black with a gun pointed at me telling me halt or I will shoot." [Court Doc. No. 56, Deposition of Loretta Duncan ("L. Duncan Dep."), p. 18]. The man stood in the doorway, and Ms. Duncan asserts that the following events transpired:

> He asked if there was anyone else in the house. I said, yes. He said, get them in here. I got everyone from the living room into the kitchen. Another man dressed in black came into my home and searched my home. When that man was finished searching my home, he told the man that was holding all the women and kids that were in the house at the time at gun point that all was clear. He walked out the door. That's when the man says, I am–and I don't remember his name and he pulled down a little velcro patch over a badge and he said, with the FBI. That's when he identified himself.

*Id.* at 19. Ms. Duncan admitted that she knew Chief Jackson and that he was not the man standing in the doorway with a gun. *Id.* at 27. She did not know whether he was the second man who entered and searched the house. *Id.* at 28. She further testified that she did not recall having any contact or conversation with Chief Jackson during the incident. *Id.* As she explained, "I don't recall even seeing Chief Jackson. He may have been the man that walked through, I don't know. If he was, then he never said anything to me." *Id.* She also testified that she never saw or had any contact with Sheriff Burnett during the incident. *Id.* at 39-40. At no time during her deposition did Ms. Duncan testify that she consented to the search of her home.

Ms. Duncan's affidavit states that along with FBI agents and other law enforcement officers, Chief Jackson entered her home with a weapon drawn. [Court Doc. No. 33, Affidavit of

-4-

Loretta Duncan ("L. Duncan Aff."), ¶ 2). However, since this assertion contradicts her deposition testimony regarding not recalling any contact with Chief Jackson, the Court will disregard this assertion, as well as any of Ms. Duncan's affidavit assertions regarding Chief Jackson's alleged activities in her home.

The parties agree that Mr. Joe Duncan was in the garage with his brother and Plaintiff Chris Jackson during the entirety of the incident. *See* [Court Doc. No. 56, Deposition of Joe Duncan ("J. Duncan Dep."), p. 45]. Mr. Duncan's brother saw someone peeking into a window of the garage and "[t]hen some guy took his foot and opened the door and he was dressed in solid black and had a machine gun in his hand." *Id.* at 46. Mr. Duncan was unable to identify the man who eventually indicated that he was looking for a bank robber. *Id.* at 46-47. The man told Mr. Duncan that he was "assisting Captain Jackson." *Id.* at 47-48. At some point Sheriff Burnett appeared in the garage. *Id.* at 50-51. Mr. Duncan asked Sheriff Burnett what was going on, and Sheriff Burnett asked him who was in the garage. *Id.* at 51. Mr. Duncan responded that his brother and Mr. Chris Jackson were the only other individuals in the garage. *Id.* Mr. Duncan described the events that followed:

> [Sheriff Burnett] walked up to me and he lifted my coat up and looked underneath my jacket. He felt of the back of my pants. I asked him, I said, Bo, what are you doing? He said, I was just looking around. He proceeded to walk through the garage and looked in the cars, under the cars, walked to the bathroom, looked in the bathroom. There is a little door to the right inside the bathroom. He opened it and there was an air compressor sitting in there. He shut it. Then he proceeded–I asked him, I said, Bo, are you searching my place? He said, no, I'm just looking around.

*Id.* at 52. Mr. Duncan further alleges that Sheriff Burnett "searched me more or less to see if I had a weapon on me." *Id.* at 53. When Mr. Duncan asked Sheriff Burnett if he had a search warrant, Sheriff Burnett responded, "I'm just here assisting Captain Jackson and these guys

-5-

here." *Id.* Mr. Duncan testified that Chief Jackson never came into the garage. *Id.* at 56. When the officers were leaving the property, Mr. Duncan saw Chief Jackson "standing directly under my street light between my house and the garage." *Id.* at 58. Mr. Duncan further alleges that he saw Chief Jackson carrying a "state of the art weapon" that resembled a machine gun. *Id.* at 61. The FBI agents left the garage and "stood there in the gate right under my street light and [were] talking to Chief Jackson." *Id.* at 79. Mr. Duncan never spoke with Chief Jackson during the incident on December 26, 2002. *Id.* at 100-01.

To the extent that Mr. Duncan alleges in his affidavit that Chief Jackson searched his property, the Court will disregard such testimony because Mr. Duncan's deposition makes clear that he only observed Chief Jackson standing between his house and his garage talking to some of the FBI agents. Mr. Duncan's affidavit testimony regarding Sheriff Burnett's activities is consistent with his deposition testimony, so the Court will not disregard this testimony.

Mr. Chris Jackson's testimony corresponds with Mr. Duncan's testimony regarding the events that transpired in the garage. *See* [Court Doc. No. 56, Deposition of Chris Jackson ("C. Jackson Dep."), pp.15-26]. According to Mr. Jackson, the FBI agent in the doorway "never quit pointing the gun" during the incident. *Id.* at 16. Mr. Jackson described how Sheriff Burnett entered the garage and touched Mr. Duncan by lifting up his jacket and putting his hand around behind Mr. Duncan's belt. *Id.* at 17. Mr. Jackson further described how Sheriff Burnett looked around Mr. Duncan's garage, looked in his car, checked the bathroom, and opened the door to the room holding the air compressor. *Id.* Mr. Jackson also recalled that Sheriff Burnett indicated that he was "assisting Captain Jackson." *Id.* at 20. Mr. Jackson further testified that the law enforcement officers would not let them out of the garage during the incident which

-6-

lasted approximately half an hour. *Id.* at 22-23. Mr. Jackson never saw Chief Jackson during the incident. *Id.* at 24-25. To the extent that Mr. Jackson's affidavit alleges that he observed Chief Jackson enter the garage or search Mr. Duncan's property, this Court will disregard such allegations as contradicting Mr. Jackson's assertion in his deposition that he did not see Chief Jackson during the incident.

Nowhere in the deposition testimony or the affidavits presented by the Plaintiffs do Plaintiffs admit that they gave consent to any law enforcement officer to search the house, the garage, or the property. Nor do Defendants point to any such evidence.

In addition to the depositions of Mr. Duncan, Ms. Duncan and Mr. Jackson, the Court also has the deposition of Plaintiffs Johnny Grooms and Debbie Jo Duncan to consider. Law enforcement officials ordered Mr. Grooms and Ms. Debbie Duncan, out of the house. Mr. Grooms alleges that Chief Jackson told him to "come out to the car" and told him that he was "under arrest." [Court Doc. No. 21-7, Deposition of Johnny Grooms ("Grooms Dep."), p. 28-29]. Chief Jackson told Mr. Grooms to put his hands on a police vehicle, and he or another officer handcuffed Mr. Grooms. *Id.* Chief Jackson also asked Ms. Debbie Duncan to come out to the police vehicle, and he allegedly pointed his gun in her direction. *Id.* at pp. 30-32; [Court Doc. No. 21-8, Deposition of Debbie Jo Duncan ("D. Duncan Dep."), pp. 35-44]. When Ms. Debbie Duncan came outside, Chief Jackson told her to put her hands on the car. D. Duncan Dep., pp. 35-44. She asked what was happening several times, and Chief Jackson allegedly told her to "shut up." *Id.* Chief Jackson never touched Ms. Duncan or placed handcuffs on her. *Id.* at pp. 37-38. Ms. Duncan asked Chief Jackson if she could just place her hands over the car because she was cold and did not have her jacket. *Id.* at p. 41. Chief Jackson told her to "shut

up and keep her hands on the car." *Id.* Chief Jackson describes the situation in this way:

> The FBI ordered at least one individual away from the home and toward my position. Following standard police procedures, I or another of the backup officers near my position secured that individual or individuals and maintained security over them until such time as their identities were discovered and the FBI determined that the suspect was not present. At the time the FBI determined that their investigation was completed, the individual(s) was then released.

[Court Doc. No. 22, Affidavit of James Jackson ("J. Jackson Aff."), ¶ 9].

Both Sheriff Burnett and Mr. Jackson estimated that the search lasted about 25 or 30 minutes. [Court Doc. No. 27-2, Deposition of Ronnie Burnett ("Burnett Dep."), p. 36]; C. Jackson Dep., p. 22.

### III. Analysis

### A. Motion to File a Reply

In addition to filing a motion to expand the record, Chief Jackson and Sheriff Burnett also move the Court to file a reply brief in reply to Plaintiffs' opposition to Defendants' motions for summary judgment. Defendants Jackson and Burnett claim that because Plaintiffs failed to file their opposition affidavits electronically and failed to serve Defendants' attorney with physical copies of opposition materials, Defendants did not receive notice of the opposition affidavits until several days after the Plaintiffs manually filed their affidavits with this Court. Therefore, Defendants argue they did not have enough time to file a reply brief prior to this Court's ruling on the motions for summary judgment.

It is true that Local Rule 5.2 requires all papers filed with the Court to be filed electronically. E.D. Tenn. L.R. 5.2. Plaintiffs do not contend that they filed their opposition affidavits electronically. Federal Rule of Civil Procedure 5 outlines the need for service of motions and other papers on the opposing party. Fed.R.Civ.P. 5. Plaintiffs did not comply with

either Fed.R.Civ.P. 5 or the local rules in filing their opposition affidavits.

However, despite the Plaintiffs' mishandling and untimeliness of the filing of their opposition affidavits, the Court does not believe additional reply briefing at this point would materially add to the record. The Court has granted Defendants' request to file Mr. Jackson's, Ms. Duncan's, Mr. Duncan's, and Sheriff Burnett's depositions in their entirety, and it has reviewed these depositions. The Defendants have also thoroughly argued their positions regarding Plaintiffs' alleged contradictions of their deposition testimony in the opposing affidavits in the motions currently pending before the Court. [Court Doc. Nos. 56, 57-1]. Further, additional argument by the Defendants in the form of a reply brief will not change the facts alleged by the Plaintiffs in their depositions. No matter how much Defendants disagree with the facts as presented by the Plaintiffs, this Court must view the facts in the light most favorable to the non-moving party on a motion for summary judgment.

Moreover, although the Defendants argue that they could not possibly have filed a reply brief within the time between their notice of the opposition affidavits and this Court's ruling on summary judgment, the Court notes that Sheriff Burnett had time to move to strike the opposing affidavits prior to this Court's ruling on summary judgment. This Court finds that if Sheriff Burnett had time to move to strike the opposing affidavits before the Court's ruling, then Defendants had time to file a reply brief to the Plaintiffs' opposition. [Court Doc. Nos. 38, 39]. Thus, this Court will **DENY** the Defendants' motions to file additional reply briefs in support of their motions for summary judgment.

### B.  Motion to Vacate Pursuant to Federal Rule of Civil Procedure 60(b)

Federal Rule of Civil Procedure 60(b) allows a court to relieve a party from a final

judgment due to:

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . ., misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, . . . or (6) any other reason justifying relief from the operation of the judgment.

Fed. R. Civ. P. 60(b).  Chief Jackson asserts that his motion should be granted because he did not have sufficient time to file reply briefing before this Court entered its judgment and/or that the Plaintiffs' depositions should be considered newly discovered evidence or evidence of fraudulent conduct.  [Court Doc. No. 56].  Therefore, this Court will review Defendants' motions pursuant to Fed. R. Civ. P. 60(b)(2)-(3).

To succeed on a claim pursuant to Fed. R. Civ. P. 60(b)(2), Defendants must "meet two requirements.  First, [Defendants] must have exercised due diligence in obtaining the new evidence. . . . Second [Defendants] must show that the new evidence is 'material and controlling and clearly would have produced a different result if presented before the original judgment.'" *DRG, Inc. v. Talent Tree, Inc.*, 119 Fed.Appx. 702, 704 (6th Cir. 2004) (quoting *Good v. Ohio Edison Co.*, 149 F.3d 413, 423 (6th Cir. 1998)).

A party seeking to vacate a judgment under Fed. R. Civ. P. 60(b)(3) must show "clear and convincing evidence of fraud or other misconduct by an adverse party."  *Williams v. State of Michigan*, 182 F.3d 920, *2 (6th Cir. 1999) (citing *Simons v. Gorsuch*, 715 F.2d 1248, 1253 (7th Cir. 1983)).  The Sixth Circuit has further expanded on the appropriate standard courts should apply under Fed.R.Civ.P. 60(b)(3):

> The proper standard . . . modifies the prevailing interpretation of Rule 60(b)(3) by requiring the moving party to demonstrate that the non-moving party engaged in deliberate or reckless misbehavior.  On the other hand, we loosen the prevailing

interpretation of the rule by dispensing with any requirement that the moving party demonstrate prejudice. Finally, we hold that although prejudice should be presumed, once the moving party has shown by clear and convincing evidence that misbehavior falling into one or more of the three categories set out in Rule 60(b)(3) has occurred, our abiding concern with the finality of judgments leads to the conclusion that the non-moving party should be permitted to demonstrate by clear and convincing evidence that the misbehavior which occurred had *no prejudicial* effect on the outcome of the litigation.

*Jordan v. Paccar, Inc.*, 97 F.3d 1452, *8 (6th Cir. 1996).

### 1. Section 1983 Claims

Defendants Jackson and Burnett have asked this Court for relief from its decision denying their motions for summary judgment based on qualified immunity. This Court has previously analyzed Plaintiffs' claims under Section 1983. [Court Doc. No. 39].

To establish a claim pursuant to Section 1983, plaintiffs must demonstrate two elements: "(1) the defendants deprived [plaintiffs] of a right, privilege, or immunity secured to [them] by the United States Constitution or other federal law; and (2) the defendants caused the deprivation while acting under color of state law." *Cunningham v. Sisk*, 2003 WL 23471531, *5 (E.D. Tenn. 2003) (citing *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 441 (6th Cir. 2000)). Only the first prong of the test is relevant in this action because there is no dispute that Defendants were acting under color of state law during the search of the Duncan property. Plaintiffs allege that the Defendants violated their Fourth and Fourteenth Amendment rights under the U.S. Constitution. U.S. Const. amend. IV; U.S. Const. amend. XIV.

Chief Jackson and Sheriff Burnett ask this Court to revisit its decision that the doctrine of qualified immunity does not shield them from liability for the alleged constitutional violations in this case. The doctrine of qualified immunity "shields 'government officials performing discretionary functions . . . from civil damages liability as long as their actions could reasonably

-11-

have been thought consistent with the rights they are alleged to have violated.'" *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).  The U.S. Supreme Court has established a two-part test for determining whether a law enforcement officer is entitled to qualified immunity.  *See Lyons v. City of Xenia*, 417 F.3d 565, 571 (6th Cir. 2005) (citing *Brosseau v. Haugen*, 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)).  Under this test district courts must:

> consider whether 'the facts alleged show the officer's conduct violated a constitutional right.' . . . If the plaintiff can establish that a constitutional violation occurred, a court should ask 'whether the right was clearly established . . . in light of the specific context of the case, not as a broad general proposition.'

*Lyons*, 417 F.3d at 571 (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

Once the defendants claim the affirmative defense of qualified immunity, the burden shifts to the plaintiffs to demonstrate that the defendants are not entitled to the defense of qualified immunity.  *Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005) (citing *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000)).  When a defendant moves for summary judgment and asserts the defense of qualified immunity, the plaintiffs must "1) identify a clearly established right alleged to have been violated; and 2) establish that a reasonable officer in the defendant's position should have known that the conduct at issue was undertaken in violation of that right."  *Pray v. City of Sandusky*, 49 F.3d 1154, 1159 (6th Cir. 1995) (citing *Johnson v. Estate of Laccheo*, 935 F.2d 109, 111 (6th Cir. 1991)).

In analyzing whether a right is "clearly established" the Supreme Court has determined that " '[t]he contours of the right must be sufficiently clear that a reasonable official would

-12-

understand that what he is doing violates that right.' " *Myers*, 2005 WL 2138543 at *8 (quoting *Anderson*, 483 U.S. at 639-40). The Sixth Circuit looks first to the decisions of the U.S. Supreme Court, then to its own decisions, then to other decisions within the Sixth Circuit, and finally to decisions of other circuits in determining whether a constitutional right has been "clearly established." *Myers*, 2005 WL 2138543 at *8.

The threshold issue to analyze is whether, based on the expanded record, Defendants violated a constitutional right. *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 589 (6th Cir. 1994). Plaintiffs allege in their complaint that the Defendants' search of the Duncan property violated their Fourth and Fourteenth Amendment rights. The Court has previously described these constitutional rights in greater detail. *See* [Court Doc. No. 39]. The Court now analyzes whether the expanded record creates a genuine issue of material fact that Defendant conducted an unreasonable search or seizure in violation of Plaintiffs' Fourth Amendment rights.

The United States Supreme Court has made clear that "[i]t is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (citations and quotations omitted); *see also O'Brien v. City of Grand Rapids*, 23 F.3d 990, 996 (6th Cir. 1994). Although consent to a search is an exception to the need for a warrant, Defendants have the burden of demonstrating consent was given freely and voluntarily. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

As this Court found in its prior opinion, the Court again concludes that the right to be free from unreasonable searches is a clearly established constitutional right. *See* [Court Doc. No.

-13-

39]; *Schneckloth,* 412 U.S. at 219 (citing *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)); *see also O'Brien*, 23 F.3d at 999.

Plaintiffs also allege that Sheriff Burnett and Chief Jackson violated their right under the Fourth Amendment to be free from unreasonable seizures. To state a claim for unreasonable seizure, plaintiffs must demonstrate that there was a seizure and that the seizure was unreasonable. *Alexander v. Beale Street Blues Co., Inc.*, 108 F.Supp.2d 934, 941 (W.D. Tenn. 1999). It is well-settled that " 'whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.'" *Michigan v. Summers*, 452 U.S. 692, 696 n. 5, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (quoting *Terry v. State of Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *see also Smith v. Heath*, 691 F.2d 220, 223 (6th Cir. 1982). Handcuffing and detention of individuals through the use of weapons that deprives individuals of their freedom of movement constitutes a seizure. *Ingram v. City of Columbus*, 185 F.3d 579, 591 (6th Cir. 1999).

However, the inquiry does not end there. To determine whether a constitutional violation occurred, the Court must analyze whether the seizure was unreasonable within the meaning of the Fourth Amendment. The Supreme Court has made clear that "not all seizures of the person must be justified by probable cause to arrest for a crime" and "reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop." *Royer*, 460 U.S. at 498 (citing *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 607 (1975); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-882, 95 S.Ct. 2574, 2580-2581, 45 L.Ed.2d 607 (1975)). However, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop" and the "investigative

methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500; *see also Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005).

The Sixth Circuit has held that "[l]aw enforcement officials have a limited authority to detain occupants of a premises while a proper search is being conducted." *United States v. Bohannon*, 225 F.3d 615, 616 (6th Cir. 2000). Defendant officers may establish that a detention, not supported by probable cause, is reasonable if "'1) [ ] the officer's conduct is supported by articulable suspicion, and 2) [ ] detention and investigative methods used were reasonable under the circumstances.'" *United States v. Heath*, 259 F.3d 522, 529 (6th Cir. 2001) (quoting *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990)). The first prong requires that there must be a reasonable, articulable suspicion of criminal activity. *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997). The Sixth Circuit "permits the use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop." *Heath*, 259 F.3d at 530 (citing *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999); *United States v. Hardnett*, 804 F.2d 353, 356-57 (6th Cir. 1986)). Based on this Supreme Court and Sixth Circuit precedent, this Court concludes that the parameters of the right to be free from unreasonable seizures are clearly established.

In support of their position that they should be entitled to qualified immunity, both Defendants rely on Sixth Circuit precedent indicating that "[a]s a general rule, mere presence at the scene of a search, without a showing of direct responsibility for the action will not subject an officer to liability." *Ghandi v. Police Department of the City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984). Police officers are acting within the scope of their qualified immunity if they have

-15-

"no direct involvement in the search" or if their "only function was to insure the integrity of the search by having uniformed officers visible on the scene." *Id.* at 352.

In other cases since *Ghandi* the Sixth Circuit and other courts within this Circuit have had an opportunity to explore the meaning of "mere presence" or mere backup support. In *Hall v. Shipley*, for example, one of the defendant officers claimed that he should be entitled to qualified immunity because he was not personally involved in the unreasonable denial of clothes to the plaintiff whose home was being searched. 932 F.2d 1147, 1154 (6th Cir. 1991). The Sixth Circuit disagreed with the defendant's characterization of his actions and determined that he was the "prime mover in obtaining the warrant" and in orchestrating the search. *Id.* The Court further concluded that "[b]oth in entering the apartment and in the manner of the search itself a direct causal connection exists between Officer Shipley's actions and the alleged constitutional violation as to the reasonableness of the search." *Id.* The Sixth Circuit affirmed the trial court's denial of qualified immunity. *Id.* In *Otero v. Wood* the district court held that three supervising officers were not entitled to qualified immunity where they directly supervised and observed the lower officers firing weapons into a crowd. 316 F.Supp.2d 612, 623-24 (S.D. Ohio 2004). The court held that the supervising officers "may all be said to have directly participated in this alleged constitutional violation since they were present in Plaintiff's immediate vicinity and they, too, failed to help and were arguably deliberately indifferent to her need." *Id.* at 624. In *Aquisto v. Danbert*, the Sixth Circuit determined that an officer who had been in the plaintiff's backyard during the allegedly "unannounced forced entry and the allegedly abusive treatment" was entitled to qualified immunity. 165 F.3d 26, 1998 WL 661145 *3 (6th Cir. 1998). The Sixth Circuit determined that another officer who entered the house with his weapon drawn

-16-

immediately after other officers rammed the door down was not entitled to qualified immunity on the wrongful entry claim. *Id.* at *4. The Sixth Circuit found that even some "limited participation" in an unlawful search "foreclos[es] qualified immunity." *Id.* at *5.

### a. Sheriff Burnett's Actions

The evidence in the expanded record, including the complete deposition transcripts of Mr. Duncan, Ms. Duncan, and Mr. Jackson, indicate that Plaintiffs assert that Sheriff Burnett entered into the Duncans' garage, patted Mr. Duncan down for weapons, and looked around the property, including looking inside Mr. Duncan's car, the bathroom, and the room where the Duncans maintained an air compressor. Sheriff Burnett undertook these activities while at least one FBI agent held Mr. Duncan, Mr. Jackson, and Mr. Duncan's brother at gunpoint with a "state of the art" weapon. J. Duncan Dep., p. 60. Further, there is no evidence in the record to suggest that Mr. Duncan consented to a search of his person or his garage. The newly added deposition transcripts do not contradict Plaintiffs' original assertions that they did not give consent for Sheriff Burnett to conduct a search of either the Duncan house or Mr. Duncan's person or his garage.

Although the expanded record now includes the entire deposition testimony of Sheriff Burnett, Defendants still do not contend that they had a valid search warrant. Rather, Sheriff Burnett contends that Mr. Duncan consented to the search. Burnett Dep., p. 15. The newly-added testimony of Mr. Duncan and Mr. Jackson confirms a genuine issue of material fact regarding whether Sheriff Burnett participated in an unreasonable search.

The Court further finds that the new deposition testimony only further elaborates on the Plaintiffs' position that Sheriff Burnett participated in the unreasonable seizure of Mr. Duncan

and Mr. Jackson. Plaintiffs have testified that at least one FBI agent, with another standing outside the door, held Mr. Jackson and Mr. Duncan at gunpoint while Sheriff Burnett searched Mr. Duncan's person and garage for approximately half an hour. The new depositions do not contradict Mr. Duncan's and Mr. Jackson's earlier position that Mr. Duncan did not consent to a search of his person or his property. Because a genuine issue of material fact remains regarding whether the Plaintiffs consented to a search of the property and Defendants do not allege that they had a warrant or other exception to the need for consent to search, the Court concludes that holding two of the Plaintiffs at gunpoint for half an hour while Sheriff Burnett searched Mr. Duncan's property and person constitutes an unreasonable seizure. The newly expanded record does not change the evidence of Sheriff Burnett's participation in the search and seizure of Mr. Duncan and his property and the seizure of Mr. Jackson. Further, Sheriff Burnett's actions clearly constitute more than mere backup assistance. He personally conducted the search of Mr. Duncan's garage and person.

### b. Chief Jackson's Actions

The newly added deposition testimony indicates that Ms. Loretta Duncan, Mr. Duncan, and Mr. Jackson did not have any personal contact with Chief Jackson during the incident. This Court thus declines to consider Plaintiffs' affidavit testimony suggesting that Chief Jackson personally searched the property. Ms. Loretta Duncan's deposition testimony indicates that she does not know if Chief Jackson was one of the officers searching her home, and Mr. Duncan's and Mr. Jackson's deposition testimony indicates that they did not interact with Chief Jackson at all during the search of the Duncan property.

However, the Court's analysis does not end here. The evidence in the record indicates

that Chief Jackson played a role in restraining two of the Plaintiffs, Mr. Grooms and Ms. Debbie Duncan. The newly expanded record does not include any evidence that Mr. Grooms and Ms. Debbie Duncan have contradicted their positions that Chief Jackson held both of them at gunpoint beside his vehicle. Chief Jackson admits that he either restrained one of the individuals sent outside or supervised other officers doing so. J. Jackson Aff., ¶ 9. Because the FBI lacked a warrant and a genuine issue of material fact exists regarding whether any Plaintiff consented to the search, the Court concludes that Chief Jackson is not entitled to summary judgment on the issue of qualified immunity for unreasonable seizure of Mr. Grooms and Ms. Debbie Duncan. Further, based on the caselaw in this Circuit, the Court concludes that Chief Jackson was more than a "mere presence" or mere backup on the scene. He did more than simply add the visible presence of another law enforcement officer. He admits he may have "secured" at least one individual at gunpoint at his vehicle. J. Jackson Aff., ¶ 9. The Court concludes that a genuine issue of material fact exists regarding whether Chief Jackson actively facilitated the search of the Duncan home by restraining two of the Plaintiffs outside the home.

Even the expanded record indicates that Defendants arguably were not conducting a proper search based on a warrant, consent, or exigent circumstances. No evidence in the expanded record suggests that Chief Jackson held a reasonable, articulable suspicion that any plaintiff was committing a crime in his presence. Nor does he present any evidence of a fear for his personal safety or a risk of flight.

Further, Plaintiffs' deposition testimony indicates that Chief Jackson was standing between the Duncan house and garage and conferring with FBI agents. The expanded record also contains evidence that Chief Jackson initiated the patdown and handcuffing of another

-19-

individual exiting the Duncan property.  Burnett Dep., pp. 14-15.  Although the newly expanded

record contradicts to some extent the scope of Chief Jackson's activities, this Court concludes

that a genuine issue of material fact remains regarding whether Chief Jackson is entitled to

qualified immunity on the issue of unreasonable search and seizure.

The Court concludes that reasonable supervising officers in Sheriff Burnett's and Chief

Jackson's positions would have known that seizing the Plaintiffs while undertaking a search

without a warrant, consent, or exigent circumstances violated clearly established law.  Even after

reviewing the newly-added evidence, the Court finds that a genuine issue of material fact exists

regarding whether Defendants' participation in the search and seizure of Plaintiffs was

reasonable under Fourth Amendment principles.  Therefore, the Court finds that the new

evidence would not have produced a different result if presented before this Court's order on

summary judgment.  Fed.R.Civ.P. 60(b)(2).

Chief Jackson also argues that this Court should vacate its judgment based on the fraud

and misrepresentation of the Plaintiffs.  *See* Fed.R.Civ.P. 60(b)(3).  This Court concludes that

while the Plaintiffs' affidavits were inartfully drafted regarding the scope of Chief Jackson's

activities, this sloppiness does not rise to the level of fraud or misrepresentation sufficient to

vacate this Court's order.  This Court finds that Defendants have not demonstrated that

Plaintiffs' looseness with the description of Chief Jackson's activities fulfills Defendants' burden

of demonstrating that Plaintiffs' engaged in deliberate or reckless misbehavior.  *Jordan*, 97 F.3d

at *8.

For example, although Ms. Loretta Duncan's affidavit states that Chief Jackson, along

with other law enforcement officers, entered her home with weapons drawn, her deposition

indicates that she is unsure whether Chief Jackson actually entered her home.  L. Duncan Aff., ¶ 2; L. Duncan Dep., pp. 27-28.  She also claims that Chief Jackson was one of several law enforcement officers "present and searching my property . . ."  *Id.* at ¶ 6.  Mr. Chris Jackson and Mr. Duncan also assert that Chief Jackson was present and searching the Duncan property, although their deposition testimony reveals they had very little interaction with Chief Jackson.  J. Duncan Dep., pp. 56-58, 100-01; C. Jackson Dep., pp. 24-25.  However, Chief Jackson admits that he was present during the incident, and he admits to securing at least one individual.  Mr. Grooms and Ms. Debbie Duncan allege that he handcuffed Mr. Grooms and held Ms. Duncan and Mr. Grooms at gunpoint.  Therefore, Mr. Jackson's, Ms. Jackson's and Mr. Duncan's affidavit testimony regarding Chief Jackson's presence during the incident is not misleading.  The only arguably misleading statements Plaintiffs make is in suggesting with certainty that Chief Jackson entered the Duncan home or searched the Duncan property.  The expanded record merely indicates that Ms. Loretta Duncan, Mr. Duncan, and Mr. Jackson are uncertain about the extent of Chief Jackson's activities.  The Court concludes that because Chief Jackson was present during the incident and participated to some extent in the law enforcement activities, he has not demonstrated that Plaintiffs' affidavit testimony is the result of deliberate or reckless misbehavior.  *See Jordan*, 97 F.3d at *8.  Therefore, this Court will deny Defendants' motion to vacate under Fed.R.Civ.P. 60(b)(3).

### 2. Claim for Trespass

Even after review of the expanded record, the Court further concludes that a genuine issue of material fact still exists regarding whether Defendants Burnett and Jackson committed the intentional tort of trespass against the Duncans.  Tennessee courts define trespass as the

-21-

unauthorized entry upon another's real property. *See Morrison v. Smith*, 757 S.W.2d 678, 681 (Tenn. Ct. App. 1988). Plaintiffs present evidence that they did not invite Defendants on their property and that they did not consent to Defendants' search of the property. Sheriff Burnett does not appear to dispute the fact that he entered the Duncan property due to his admission of entering the Duncan garage. Burnett Dep., p. 15. Although the record is not as clear regarding whether Chief Jackson entered onto the Duncan's property, the Court finds that a genuine issue of material fact exists regarding whether Chief Jackson entered the Duncan's yard without authorization.

### III. Conclusion

After reviewing the expanded record and the applicable law, the Court concludes that it will **GRANT** Chief Jackson's and Sheriff Burnett's motions to expand the record to include the complete depositions of Loretta Duncan, Joe Duncan, Chris Jackson, and Sheriff Burnett. The Court will **DENY** Chief Jackson's and Sheriff Burnett's motions to file reply briefs, and the Court will **DENY** Chief Jackson's and Sheriff Burnett's motions for relief from this Court's order on summary judgment.

*/s/ R. Allan Edgar*
R. ALLAN EDGAR
UNITED STATES DISTRICT JUDGE